IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02704-NYW

JAYME TRINETTE HILL,

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

    This civil action arises under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401–33 and 1381–83(c) for review of the Commissioner of Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Jayme Hill's ("Plaintiff" or "Ms. Hill") applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to the Order of Reassignment dated March 29, 2018 [#18], this civil action is before this Magistrate Judge for a decision on the merits. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

## PROCEDURAL HISTORY

    This case arises from Plaintiff's applications for DIB and SSI protectively filed on May 30, 2013. [#8-3 at 96, 97].[1] Ms. Hill graduated from high school, obtained her associate's degree in

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system but the page number associated with the Record, found in the bottom right-hand

business, and worked as a customer service representative for Frontier Airlines, as a real estate intern and then agent, as a customer service representative for Nextel, as a customer service representative for TeleTech Customer Care Management, as a work-study participant for the Community College of Aurora's financial aid and administration department, and currently as a driver for Lyft for roughly 20 hours per week. *See* [#8-2 at 39-43; #8-6 at 288; 312-15; #8-7 at 321-26, 330-34, 335, 364]. Ms. Hill alleges she became disabled on January 21, 2011 [#8-3 at 98], later amended to October 11, 2012 [#8-2 at 37], due to injuries to both her hands, chronic regional pain syndrome ("CRPS") of the right hand, and carpal tunnel syndrome of the left hand, *see* [#8-7 at 349]. Ms. Hill was thirty-seven years-old on the amended alleged onset date of her claimed disability.

The Social Security Administration denied Plaintiff's application administratively on February 11, 2014. *See* [#8-2 at 96, 97; #8-4 at 144-48]. Ms. Hill requested a hearing before an Administrative Law Judge ("ALJ"), *see* [#8-4 at 152-54], which ALJ Patricia E. Hartman (the "ALJ") held on June 4, 2015, *see* [#8-2 at 63]. Following this hearing, the ALJ issued a decision finding Ms. Hill not disabled. *See* [#8-3 at 123, 133]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council granted. *See* [*id.* at 139]. The Appeals Council remanded Ms. Hill's case back to the ALJ because the ALJ's Residual Functional Capacity ("RFC") determination was "wholly inconsistent" with the opinion of John Sacha, M.D., who opined that Ms. Hill could not maintain gainful employment, which the ALJ afforded great weight. *See* [*id.* at 141]. The Appeals Council directed the ALJ on remand to "[g]ive further consideration to the claimant's maximum [RFC] and provide appropriate rationale with specific references to

---

corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

evidence of record in support of the assessed limitations" and "[i]f warranted by the expended record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . ." [*Id.* at 141-42].

Following remand, the ALJ conducted a second hearing on November 22, 2016. [#8-2 at 32]. At the hearing, Ms. Hill proceeded through counsel, and the ALJ received testimony from Plaintiff and Vocational Expert Pat W. Pauline (the "VE"). *See* [*id.* at 15, 36, 58]. Relevant here, Plaintiff testified that her only reason for not working since 2012 was her hands. *See* [*id.* at 43-44]; *see also* [*id.* at 46 (testifying that she does not have any mental ailments that preclude her from working)]. She explained that she "got a cramp in [her] hand" while working for Frontier Airlines in 2011, which was so severe that she could not move her hand and caused her to file a worker's compensation claim. [*Id.* at 42]. Plaintiff continued that Dr. Sacha informed her she had CRPS, and that her CRPS only slightly responded to physical therapy, cortisone shots in her wrists, "shots in her neck", Gabapentin, and Motrin. [*Id.* at 44-45]. She also attested that her right wrist was worse than her left wrist. [*Id.* at 47].

Plaintiff testified that while she currently works as a Lyft driver, her hours vary depending "on how [her] hands are feeling." [*Id.* at 39]. For instance, she testified that driving sometimes causes her hands to swell, cramp to the point that she cannot move them, itch, and burn, causing her to stop driving that day. *See* [*id.* at 40-41, 53]. Further, Plaintiff explained that someone else washes her car because "[t]hat [would] kill her hands." [*Id.* at 52]. Plaintiff's issues with her hands also prohibited her from maintaining employment as a caretaker for the elderly because she had to push wheelchairs and transfer clients to and from bed, *see* [*id.* at 44], and as a real estate agent because of the amount of typing required to draft real estate sales contracts, *see* [*id.* at 55]. Indeed, Ms. Hill testified that "sometimes writing, typing, [and] grabbing" make her hand pain

worse, and that sleep "is the best thing for [the pain]" which is why she tries to nap on days when the pain is the worst. [*Id.* at 47, 48]. Ms. Hill also testified that she did not have any issues grooming herself, though her hair takes longer to "get done," [*id.* at 48, 57], but that she avoids clothes with buttons or zippers because they are too difficult to manipulate, [*id.* at 57].

The VE also testified at the hearing. The VE first summarized Plaintiff's past relevant work to include: a customer service representative, specific vocational preparation ("SVP") level 5, sedentary; a reservation agent, SVP level 4, sedentary; an administrative clerk, SVP level 4, light exertion; a table clerk, SVP level 4, sedentary; and a realtor, SVP level 5, light exertion. *See* [#8-2 at 59].

The VE then considered the work an individual could perform who could perform light work with the additional limitations of occasionally using hand controls, handling, fingering, and feeling; frequently reaching in all directions; and no kneeling, crawling, climbing ladders or scaffolds, or working at unprotected heights, with dangerous unprotected machinery, or with vibrating tools. [#8-2 at 59-60]. The VE testified that this individual could perform only Ms. Hill's previous work as a customer service representative. [#8-2 at 60]. In addition, the VE testified that, consistent with the Dictionary of Occupational Titles, this individual could also perform sedentary jobs as a callout operator and surveillance system monitor, both SVP level 2 jobs.[2] [*Id.* at 60]. In response to Plaintiff's counsel's question, the VE also stated that employers for these jobs would tolerate "no more than ten percent" of being off task. [*Id.* at 61].

---

[2] Upon further questioning by the ALJ, the VE also identified jobs of investigator of dealer accounts and counter clerk, but the VE could not identify the numbers of jobs that were available in the national economy. [#8-2 at 61-62]. The ALJ ultimately did not rely on these two additional jobs, and the court will not consider them.

4

On December 15, 2016, the ALJ issued a decision finding Ms. Hill not disabled under the Act. [#8-2 at 25]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner [*id.* at 1-3]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on November 13, 2017, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *cf. Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) ("[I]f the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." (internal citation omitted)). The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). But "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court may not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted).

## ANALYSIS

I.  **The ALJ's Decision**

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). Supplemental Security Income is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act. 42 U.S.C. § 1382. An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214–15 (2002). Additionally, the claimant must prove she was disabled prior to his date last insured. *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(4)(v). *See also Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations. *Id.*; *see also* 20 C.F.R. § 404.1520(e). If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision

6

maker proceeds to step three. *Williams*, 844 F.2d at 750. Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines the maximum amount of work the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751; *see also id.* at 751–52 (explaining the decisionmaker must consider both the claimant's exertional and nonexertional limitations). The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, 614 F. App'x 940, 943 (10th Cir. 2015) (citation omitted). "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120. The Commissioner can meet her burden by the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99, 1101 (9th Cir. 1999).

The ALJ found that Ms. Hill met the insured status requirements for DIB through December 31, 2017, and had not engaged in substantial gainful activity since October 11, 2012. [#8-2 at 18]. At step two the ALJ determined Ms. Hill had the following severe impairments: obesity and bilateral carpal tunnel syndrome status post-surgical release on the right with a history of CRPS. [*Id.* at 19]. At step three the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d),

7

416.920(d)). [*Id.*]. The ALJ then determined Plaintiff had the RFC to perform light work subject to several limitations [*id.*], and concluded that Ms. Hill could perform her previous work as a customer service representative [*id.* at 24]. Though the ALJ concluded that Ms. Hill was not disabled under the Act at step four, she also concluded at step five that there existed two additional jobs Ms. Hill could perform in the national economy. [*Id.* at 24-25].

Ms. Hill now appeals the ALJ's decision to this court. In doing so, she raises just one issue: "[t]he ALJ committed reversible error in failing to comply with the [Appeals Council's] remand order regarding further evaluation of Dr. Sacha's opinion." [#13 at 10]. I consider this argument below.

## II. Compliance with Remand Order: Further Evaluation of Dr. Sacha's Opinion

Pursuant to Social Security regulations, upon remand from the Appeals Council, "[t]he [ALJ] shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has construed this regulation as allowing the ALJ to reevaluate her findings, including the claimant's RFC, on remand, because "[t]o hold otherwise would discourage [ALJs] from reviewing the record on remand, checking initial findings of fact, and making corrections, if appropriate." *Campbell v. Bowen*, 822 F.2d 1518, 1522 (10th Cir. 1987); *see also Hamlin v. Barnhart*, 365 F.3d 1208, 1224 (10th Cir. 2004) ("It was certainly within the ALJ's province, upon reexamining Mr. Hamlin's record [on remand], to revise his RFC category."). Indeed, binding the ALJ to her prior decision on remand would "'constrain the ALJ in a manner not mandated by the regulations.'" *Miller v. Barnhart*, 175 F. App'x 952, 956 (10th Cir. 2006) (quoting *Campbell*, 822 F.2d at 1522).

8

As mentioned, the Appeals Council remanded Ms. Hill's case to the ALJ because the ALJ placed great weight on the opinion of Dr. Sacha whose opinion that Plaintiff could not maintain gainful employment was "wholly inconsistent" with the ALJ's RFC determination. *See* [#8-3 at 141]. The Remand Order directed the ALJ to:

- Give further consideration to the claimant's maximum [RFC] and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations . . . .

- If warranted by the expended record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . .

[#8-3 at 141-42]. Plaintiff argues that the ALJ failed to follow these directives because the ALJ did not further consider Dr. Sacha's opinion and "out right discounted the opinion" at the second hearing. [#13 at 10]. Plaintiff further avers that Dr. Sacha's opinion finding marked limitations in most areas of functioning, *see* [#8-14 at 917-28], was not inconsistent with his earlier opinions of more moderate functional restrictions, and that Dr. Sacha's opinions were consistent with David W. Yamamoto, M.D.'s opinion. *See* [#17 at 2-3]. According to Plaintiff, substantial evidence does not support the ALJ's findings concerning Dr. Sacha's opinions.

In formulating a claimant's RFC, the ALJ must address medical source opinions. The Social Security regulations afford a treating source opinion controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c); *see also* 20 C.F.R. § 404.1527(b), (c). But even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. §§ 404.1527, 416.927. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); SSR 96-2p, 1996 WL 374188, at *4. These factors include:

1. the length of the treatment relationship and the frequency of examination;
2. the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
3. the degree to which the physician's opinion is supported by relevant evidence;
4. consistency between the opinion and the record as a whole;
5. whether or not the physician is a specialist in the area upon which an opinion is rendered; and
6. other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted). Neither the regulation nor the court require a factor-by-factor recitation, but the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks omitted); *accord Watkins*, 350 F.3d at 1301 ("if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." (internal quotation marks omitted)).

The record contains several progress notes and impressions from Dr. Sacha. The ALJ afforded significant weight to several of those opinions: (1) January 18, 2013, Dr. Sacha noted that he had "not taken [Ms. Hill] off work specifically for the left upper extremity", but that Plaintiff had some work restrictions, [#8-14 at 875]; (2) February 21, 2013, Dr. Sacha assessed left upper extremity work restrictions, consistent with his January 18, 2013 restrictions, of "no repetitive activities . . . greater than 1 hour without a 10 min[ute] rest[,] no prolonged power grip/pinch, [and] no lifting [more than] 10 [pounds]," [*id.* at 864]; (3) May 20, 2013, Dr. Sacha assessed left wrist work restrictions of "only 15 minutes of repetitive activity before having a 15-minute break. She can lift up to 15 pounds." [*id.* at 856]; and (4) November 5, 2013, Dr. Sacha found reasonable Dr. Yamamoto's opinion that Ms. Hill had a 10% right upper extremity impairment and a 13% left upper extremity impairment for a combined 22% whole person permanent impairment, [#8-12 at

702-03]. The ALJ explained that these opinions were "based on treatment or examination of the claimant" and were generally consistent with the other medical source opinions and the medical record "that documents substantial improvement in [Plaintiff's] right hand/wrist and mostly mild abnormalities of her hands and wrists." [#8-2 at 23]. The ALJ further noted that Dr. Sacha's work restrictions applied only to Plaintiff's left upper extremity, which suggested an ability to lift more weight with both arms, and prohibited only repetitive manipulation, which supported frequent reaching and occasional fingering, handling, and feeling. *See* [*id.*].

The ALJ found Dr. Sacha's August 2014 opinions less persuasive, however. *See* [*id.*]. In the CRPS Medical Source Statement, Dr. Sacha identified no leg issues and that Ms. Hill could sit and stand for more than 2 hours at a time and for at least 6 out of 8 hours per day, but that Ms. Hill required a job that permits shifting positions at will from sitting, standing, or walking. *See* [#8-14 at 918]. Dr. Sacha also opined that Plaintiff needed to walk around during the 8-hour work day for 90 minutes, that she needed to walk for 10 minutes at a time, and that her muscle weakness, pain/paresthesia, numbness, and chronic fatigue required frequent unscheduled breaks of 10 minutes. *See* [*id.* at 918-19]. Dr. Sacha noted that Plaintiff could only rarely lift less than 10 pounds, and that Ms. Hill's pain/paresthesias, muscle weakness, limitation of motion, motor loss, swelling, sensory loss/numbness, and medication side effects significantly limited Plaintiff's ability to reach, handle, and finger, such that Ms. Hill could do so for only 4% (right upper extremity) and 10% (left upper extremity) of the time out of an 8-hour work day. *See* [*id.* at 919]. Dr. Sacha concluded that Plaintiff would be off task 25% or more of the time because of her symptoms and that she would miss more than 4 days per month; Dr. Sacha represented that Plaintiff's impairments were reasonably consistent with her symptoms and limitations. *See* [*id.* at 920].

Then, in the General RFC Questionnaire, Dr. Sacha identified Ms. Hill's symptoms as bilateral arm pain/swelling, right arm hyperpathia/allodynia, left arm numbness/weakness, and lost grip and pinch strength. [*Id.* at 923]. He then identified positive objective signs for reduced range of motion in both arms, sensory loss, reflex change, tenderness, crepitus, swelling, muscle atrophy, and muscle weakness; Dr. Sacha represented that Ms. Hill's impairments were reasonably consistent with the symptoms and functional limitations assessed. [*Id.*]. Dr. Sacha continued that Ms. Hill could lift less than 10 pounds on an occasional basis but no amount of weight on a frequent basis; that Ms. Hill had no limits sitting, standing, or walking, including no walking around or needing to sit down after periods of walking or standing; that Ms. Hill could frequently twist, stoop, crouch, occasionally climb stairs, and never climb ladders; that for both arms Ms. Hill could rarely reach over her head, never reach forward, never handle (gross manipulation) or finger (fine manipulation), and rarely feel; that Ms. Hill would never need to lie down at unpredictable intervals; that Ms. Hill would miss more than 3 days per month because of her impairments; and that Ms. Hill should largely avoid extreme cold and heat, wetness, humidity, and hazardous machinery, heights, etc. *See* [*id.* at 924-27].

The ALJ concluded that these "rather extreme limitations" were "markedly inconsistent" with Dr. Sacha's prior work restrictions regarding Plaintiff's ability to sit, stand, or walk and did not find support in the medical record. *See* [#8-2 at 23]. The ALJ continued that these restrictions were inconsistent with Ms. Hill's testimony that her hands posed the only functional limitations and that she had no issues standing, sitting, or walking (which she did for exercise). [*Id.*]. The ALJ also found that Dr. Sacha's marked limitations were inconsistent with the medical evidence that documented improvement in Ms. Hill's right hand/wrist with mostly mild abnormalities, and that his opinion regarding the severity of Ms. Hill's symptoms was "markedly inconsistent" with

12

the medical evidence that suggested no allodynia or skin temperature, texture, or color changes, largely normal strength (aside from two instances where Ms. Hill did not put forth full effort), and mild and infrequent swelling. *See* [*id.* at 23-24]. I respectfully agree with the Commissioner that the ALJ's discussion of Dr. Sacha's opinions satisfied the Remand Order's directive and sufficiently explained the weight assigned to Dr. Sacha's August 2014 opinions. *See Oldham*, 509 F.3d at 1258.

In addition, I find that substantial evidence supports the ALJ's determination. Beginning in 2013—the year in which the ALJ placed great weight on the opinions of Dr. Sacha—medical records reveal that Ms. Hill's condition remained largely unchanged. For instance, February 25, 2013 treatment notes of Dr. Alijani indicate that Ms. Hill reported that driving, lifting heavy objects, and any repetitive use of her hands exacerbates her symptoms, that she wakes 4 times per night with hand numbness, and that rest and avoiding repetitive use of her hands provides the best relief. [#8-12 at 689]. But physical exams revealed no acute distress; that her right upper extremity was negative for Tinel's sign (nerve irritation), Phalen's test (carpal tunnel syndrome), and Adson's test (thoracic outlet syndrome), and that her sensation, skin, and vascular exams were normal; that her left upper extremity exam revealed no tenderness, swelling, deformities, instability, weakness, subluxations, atrophy, decreased range of motion, or pain in her shoulder, elbow, forearm, and hand, and that her sensation, skin, and vascular exams were normal; and that her left wrist had full range of motion, no pain or crepitance, but was positive for median nerve compression and carpal tunnel syndrome. [*Id.*]. Dr. Alijani's treatment notes dated April 8, 2013 revealed the same physical exam results as from February 25, 2013. [*Id.* at 687]. Relatedly, Colorado Pain and Rehabilitation, PLLC treatment notes dated March 14 to March 27, 2013 indicated that Plaintiff reported a pain level of 3-4 out of 10, that her pain is present 1-4 hours per

13

day depending on the activity, and that she could not write, type, or grip for more than 15 minutes. *See* [*id.* at 680-86]. But physical exams revealed no "pain behaviors or signs of distress and nonphysiological pain signs", "mild swelling over the distal forearm", "some very mild swelling on the extensor portion in the same region", "decreased extension", "discomfort with some focal pain along the radiocarpal complex", "full faculty and finger strength with some aggravation", "good strength without any myotomal weakness through the flexor and extensor muscles", "[s]ensation is intact with some hyperesthesia along the carpal tunnel and traverse carpal arch", "some mild median nerve tension signs", and "normal reflexes". [*Id.* at 685].

Dr. Sacha's progress notes are largely similar to the findings above. On January 14, 2013, Dr. Sacha reported no swelling of Ms. Hill's upper left extremity, some mild tenderness over the carpal row, positive carpal tunnel compression test, positive Tinel's test over the median nerve but negative ulnar Tinel's test, and no allodynia, hyperpathia, or skin trophic changes. [#8-14 at 881-86]. Dr. Sacha saw Plaintiff again on January 22, 2013, when Ms. Hill reported pain in her right wrist and shoulder, but Dr. Sacha noted no other changes in her symptoms; Dr. Sacha also reported some mild tenderness of the right upper extremity, some mild crepitus on range of motion of wrist, a positive carpal tunnel compression test, a normal shoulder exam, as well as no nerve root pain, allodynia, hyperpathia, swelling, or skin trophic changes. [*Id.* at 873]. On February 5, 2013, Dr. Sacha conducted a reevaluation of Ms. Hill following corticosteroid injections in her left wrist and noted that Ms. Hill reported 90% relief from symptoms for 4 days before her symptoms returned, and her physical exam was largely normal, revealing a positive carpal tunnel compression on the left wrist, but no swelling, allodynia, hyperpathia, skin trophic changes, or nerve pain. [*Id.* at 867]. Progress notes dated March 5, 2013 again revealed a positive carpal tunnel compression on the left wrist with nerve irritation, some mild pain and tenderness, but no allodynia, hyperpathia, or skin

14

trophic changes. [*Id.* at 860]. Dr. Sacha's April 2, 2013 Progress Report indicated that Ms. Hill reported no improvement in her left wrist symptoms following conservative treatments, but that she has minimal pain behaviors, walks with a normal gait, some minimal edema in both upper extremities, mild tenderness over wrist, no crepitus, decreased sensation in median nerve distribution on the left, and 5/5 grip strength. [*Id.* at 857]. Dr. Sacha then noted a 15-minute restriction on repetitive tasks and a 10-pound lifting restriction on a Physician's Report of Worker's Compensation Injury. [*Id*. at 859].

Plaintiff returned to Dr. Sacha on May 20, 2013, and Dr. Sacha noted that Ms. Hill decided against surgery on her left upper extremity and that Ms. Hill's case was appropriate for closure because she completed all conservative care. [#8-14 at 855]. Dr. Sacha's physical exam noted some swelling in both upper extremities but no allodynia, hyperpathia, or skin trophic changes, and that there was some diminished range of motion in left wrist, positive carpal tunnel compression on the left wrist, and some mild tenderness. [*Id.*]. Dr. Sacha opined that Plaintiff had a 4% range of motion impairment for her upper left extremity coupled with a 4% sensory loss impairment for a total 5% whole person permanent impairment due to her upper left extremity symptoms. [*Id.* at 856].

Due to continued pain (rated at a 5 out of 10) in her right hand, Ms. Hill returned to Dr. Sacha on July 23, 2013. *See* [#8-14 at 853]. Dr. Sacha reported that Ms. Hill displayed no apparent distress, that her bilateral upper extremity range of motion was good, that her right wrist had edema with pain and tenderness to palpation, but that she showed no erythema, no allodynia, no skin trophic changes; Dr. Sacha also noted equal temperature in both hands, 5/5 muscle strength and within functional range of motion, pain at the wrist but no positive pain symptoms in hands or fingers bilaterally, no tenderness to palpation at the medial or lateral epicondyles, and negative for

15

nerve pain. *See* [*id.* at 853]. On September 24, 2013, Dr. Sacha reported mild swelling in both hands, but no allodynia, hyperpathia, or skin trophic changes. [*Id.* at 851]. On October 22, 2013, Dr. Sacha reported minimal edema in both hands with no allodynia, hyperpathia, or skin trophic changes bilaterally, but that Ms. Hill was still positive for carpal tunnel compression on the left greater than the right with some mild tenderness on the left. [*Id.* at 849]. On November 5, 2013, Dr. Sacha's skin examination revealed no peripheral edema, swelling, erythema, allodynia, hyperpathia, or trophic changes. [#8-12 at 702].

Beginning in 2014, Dr. Sacha noted on January 7, 2014 that Ms. Hill's symptoms "are about the same" from his last exam, that she exhibited a "slight increase in pain behaviors" and bilateral carpal tunnel compression, but no allodynia, hyperpathia, or skin trophic changes. [#8-12 at 700]. In a letter dated February 4, 2014 regarding Ms. Hill's worker compensation claim, Dr. Sacha indicated that Ms. Hill likely needed roughly 3-5 more years of treatment and that CRPS was not a lifelong ailment, though its duration was unpredictable. *See* [#8-14 at 840-41]. In another letter dated April 15, 2014, Dr. Sacha expressed his disagreement with the results of Dr. Sollender's Independent Medical Exam, proclaiming that Ms. Hill's condition appeared worse from February to March 2014 and that he believed she needed continued maintenance care above simply prescribing medication. *See* [*id.* at 838]. Then, as discussed in detail above, Dr. Sacha opined on August 4, 2014 that Ms. Hill suffered from severe functional limitations that precluded any gainful employment. *See* [*id.* at 917-28]. But in a follow-up appointment on September 9, 2014, Dr. Sacha noted that Ms. Hill reported intermittent flare ups of her symptoms, which was not uncommon, and that there was "nothing out of the ordinary with no new findings or complaints." [#8-15 at 1011]. He continued that Ms. Hill had mild swelling in the wrist, some mild allodynia in the right hand, decreased sensation greater in the right than left hand of the

16

median nerve distribution, motor strength was 5/5 "with some decreased effort", and positive carpal tunnel compression greater on the left than right. [*Id.*].

The court agrees with the ALJ's conclusion that Dr. Sacha's marked limitations in August 2014 were "wholly inconsistent" with the medical evidence, including Dr. Sacha's own progress notes from 2013 and 2014 recounted above.³ Indeed, the last objective medical evidence is an October 3, 2016 bone scintigraphy scan that returned negative for CRPS. *See* [#8-15 at 1015]. To the extent there is conflicting evidence, Plaintiff has not directed the court to it and it is for the ALJ to resolve such conflicts, *see Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016), as this court may not "displace the agency's choice between two fairly conflicting views", *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (brackets omitted). The same is true of any conflicts between Dr. Sacha's opinions and that of other medical sources: the ALJ, not the court, is responsible for resolving any inconsistencies between medical source opinions. *See Smith v. Colvin*, 821 F.3d 1264, 1268 (10th Cir. 2016).

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.

DATED: November 9, 2018

BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge

---

³ I also note the inconsistencies with Dr. Sacha's August 2014 opinions in his CRPS Medical Source Statement—that Ms. Hill needed to walk for 90 minutes at 10-minute intervals throughout the day and needed a job that allowed for shifting positions at will to sitting, standing, or walking—and his General RFC Questionnaire—that Ms. Hill had no limits on her ability to sit, stand, or walk and did not need to change positions at all within an 8-hour window. *Compare* [#8-14 at 918] *with* [*id.* at 924-25].